UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
DENISE GRETA DAIS,

                Plaintiff,

        - against -

ANDREW SAUL,[1]

                Defendant.
---------------------------------------------------------x

**MEMORANDUM & ORDER**
18-CV-7309 (PKC)

PAMELA K. CHEN, United States District Judge:

Plaintiff Denise Greta Dais brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the decision made by the Commissioner of the Social Security Administration ("SSA") denying Plaintiff's claim for Supplemental Security Income ("SSI"). Before the Court are Plaintiff's motion for judgment on the pleadings and the Commissioner's cross-motion for judgment on the pleadings. Plaintiff seeks reversal of the Commissioner's decision, or alternatively, remand for further administrative proceedings. The Commissioner seeks affirmation of the decision to deny benefits. For the reasons that follow, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion. This case is remanded for further proceedings consistent with this Memorandum and Order.

---

[1] Andrew Saul became Commissioner of the Social Security Administration on June 17, 2019. Pursuant to Federal Rule of Civil Procedure 25(d), Andrew Saul is substituted as Defendant in this action. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party."); *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office."). The Clerk of Court is respectfully directed to update the docket accordingly.

## BACKGROUND

**I.      Procedural History**

On September 29, 2015, Plaintiff filed an application for SSI, claiming that she was disabled as of July 1, 2015. (Administrative Transcript ("Tr."[2]), Dkt. 9, at 169–77.) Her application was denied on March 16, 2016. (*Id.* at 103.) After requesting a hearing (*id.* at 109), Plaintiff appeared before Administrative Law Judge ("ALJ") Laura Michalec Olszewski on August 10, 2017 (*id.* at 34–81). On November 27, 2017, the ALJ found that Plaintiff was not disabled. (*Id.* at 10–29.) The ALJ's decision became final on October 23, 2018, when the SSA's Appeals Council declined Plaintiff's request to review that decision. (*Id.* at 1–7.) This timely appeal followed.[3] (*See generally* Complaint ("Compl."), Dkt. 1.)

**II.     The ALJ Decision**

In evaluating disability claims, the ALJ must adhere to a five-step inquiry. The plaintiff bears the burden of proof in the first four steps of the inquiry; the Commissioner bears the burden

---

[2] Page references prefaced by "Tr." refer to the continuous pagination of the Administrative Transcript (appearing in the lower right corner of each page) and not to the internal pagination of the constituent documents or the pagination generated by the Court's CM/ECF docketing system.

[3] According to Title 42, United States Code, Section 405(g),

> [a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to [her] of notice of such decision or within such further time as the Commissioner of Social Security may allow.

42 U.S.C. § 405(g). "Under the applicable regulations, the mailing of the final decision is presumed received five days after it is dated unless the [plaintiff] makes a reasonable showing to the contrary." *Kesoglides v. Comm'r of Soc. Sec.*, No. 13-CV-4724 (PKC), 2015 WL 1439862, at *3 (E.D.N.Y. Mar. 27, 2015) (citing 20 C.F.R. §§ 404.981, 422.210(c)). The final decision was issued October 23, 2018 (Tr. at 1), and the Complaint was filed on December 21, 2018 (Compl., Dkt. 1)—59 days later—rendering this appeal timely.

in the final step. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). First, the ALJ determines whether the plaintiff is currently engaged in "substantial gainful activity." 20 C.F.R. § 416.920(a)(4)(i). If the answer is yes, the plaintiff is not disabled. If the answer is no, the ALJ proceeds to the second step to determine whether the plaintiff suffers from a severe impairment. *Id.* § 416.920(a)(4)(ii). An impairment is severe when it "significantly limits [the plaintiff's] physical or mental ability to do basic work activities." *Id.* § 416.922(a). If the impairment is not severe, then the plaintiff is not disabled. In this case, the ALJ found that Plaintiff "ha[d] not engaged in substantial gainful activity since September 15, 2015, the alleged application date," and that Plaintiff had the following severe impairments: lumbar degenerative disc disease; osteoarthritis; diastolic heart failure; asthma; hypertension; hyperlipidemia; history of hernia repair; and diabetes mellitus. (Tr. at 16.)

Having determined that Plaintiff satisfied her burden at the first two steps, the ALJ proceeded to the third step and determined that none of Plaintiff's impairments met or medically equaled the severity of any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"), including 1.02, 1.04, 3.03, 4.02, 4.04, and 5.00. (*Id.*) More specifically, the ALJ found that Plaintiff's physical impairments did not meet the listed criteria because "[the] record does not establish that [Plaintiff's lumbar disc and joint disease] have resulted in an inability to perform fine and gross movements effectively . . . or an ability to ambulate effectively." (*Id.*) The ALJ found that, based on the record, Plaintiff's other physical impairments failed to meet their respective listing criteria. (*Id.* at 16–17.)

Moving to the fourth step, the ALJ found that Plaintiff maintained residual functional capacity ("RFC")[4] to perform

> sedentary work[5] as defined in 20 [C.F.R. §] 416.967(a). She can lift, carry, push, and pull up to ten pounds occasionally and less than ten pounds frequently, and can sit for up to six hours and stand and/or walk for up to two hours in an eight-hour workday. However, after sitting for 30 minutes she requires the freedom to stand for five minutes without going off task during this transition. She requires the use [of] a cane to ambulate. She can occasionally climb ramps and stairs, balance, and stoop, but can never kneel, crouch, crawl, or climb ladders, ropes, or scaffolds. She can never reach overhead but can frequently reach in all other directions. She can tolerate occasional exposure to respiratory irritants such as dusts, odors, fumes, gasses, and extreme hot and cold temperatures.

(*Id.* at 18.)

The ALJ then proceeded to step five to determine whether Plaintiff—given her RFC, age, education, and work experience—had the capacity to perform any other substantial gainful work in the national economy. 20 C.F.R. § 416.920(a)(4)(v). The ALJ accepted the testimony of the vocational expert and determined that, based on her RFC, "[Plaintiff] is capable of performing past relevant work as a Receptionist . . . as it is generally performed in the national economy at the sedentary exertional level, but not as [Plaintiff] described actually performing it at the medium to heavy exertional levels." (Tr. at 26.) Alternatively, the ALJ also found that, given Plaintiff's RFC,

---

[4] To determine a plaintiff's RFC, the ALJ must consider the plaintiff's "impairment(s), and any related symptoms . . . [which] may cause physical and mental limitations that affect what [the plaintiff] can do in a work setting." 20 C.F.R. § 416.945(a)(1).

[5] According to the applicable regulations,

> [s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 416.967(a).

4

age, education, and work experience, Plaintiff could make the adjustment to, and perform work as, an appointment clerk and sorter. (*Id.* at 27–28.)

In reaching her decision, the ALJ considered the medical evidence submitted into the record,[6] and Plaintiff's testimony at the hearing, in which Plaintiff described her daily activities and limitations, including pain in her back that tightens up and radiates down her legs into numbness, and difficulty with sitting or standing for long periods. (*Id.* at 46–65.) The ALJ concluded that Plaintiff was not disabled within the meaning of the SSA regulations. (*Id.* at 28.)

## STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Social Security Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits. 42 U.S.C. § 405(g). In reviewing a final decision of the Commissioner, the Court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera*, 697 F.3d at 151 (internal quotation marks and citation omitted). "Substantial evidence [is] more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks and alterations omitted). In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation marks and citation omitted). However, the Court "defer[s] to the

---

[6] On October 5, 2017, two months after the hearing, Plaintiff's representative submitted additional medical evidence pertaining to treatment Plaintiff received at the Woodhull Medical Center through September 26, 2017. The ALJ declined to admit the new evidence, reasoning that Plaintiff did not satisfy the criteria of 20 C.F.R. § 416.1435(b) and had not provided good cause. (*See* Tr. at 13–14.)

5

Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012). If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013).

## DISCUSSION

I. **Evaluation of the Medical Opinion Evidence**

Plaintiff argues that the ALJ's opinion is not supported by substantial evidence in the record as the ALJ failed to properly weigh the medical opinion evidence. (Plaintiff's Brief ("Pl.'s Br."), Dkt. 11, at 8–15.) The Court agrees.

A. **The ALJ Failed to Accord Proper Weight to the Opinions of Plaintiff's Treating Sources**

Plaintiff contends that the ALJ "mischaracterized the record" in concluding that there was insufficient clinical and objective evidence to support the opinions of Plaintiff's treating sources (*id.* at 9), physiatrist Dr. Cheng and Nurse Practitioner ("NP") Agnes Toussaint, and erred in giving "little weight" to their opinions (*id.* at 9, 14). Instead, the ALJ gave "partial" and "great" weight to different parts of the opinion of the Agency's one-time consultative examiner, Shenecia Beecher, M.D. (*Id.* at 23–24.) The Court agrees with Plaintiff and finds that the ALJ failed to adhere to the treating physician rule.[7]

---

[7] Although "[t]he current version of the [Social Security Act's] regulations eliminates the treating physician rule," the rule nevertheless applies to Plaintiff's claim, which was initially filed on September 29, 2015, as the current regulations only "apply to cases filed on or after March 27, 2017." *Burkard v. Comm'r of Soc. Sec.*, No. 17-CV-00290 (EAW), 2018 WL 3630120, at *3 n.2 (W.D.N.Y. July 31, 2018); *see also* 20 C.F.R. § 404.1520c. Plaintiff's claim was filed in September 2015 (*see* Tr. at 169–77), and so the treating physician rule still applies.

6

The SSA has mandated specific procedures an ALJ must follow when considering the weight to assign to a treating physician's opinion. *See* 20 C.F.R. § 404.1527. "[T]he opinion of a [plaintiff]'s treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)). There are several factors that an ALJ must explicitly consider when weighing medical evidence. As the Second Circuit has explained:

> An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various factors to determine how much weight to give to the opinion. Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the [SSA]'s attention that tend to support or contradict the opinion. The regulations also specify that the Commissioner will always give good reasons in [her] notice of determination or decision for the weight [she] gives claimant's treating source's opinion.

*Halloran v. Barnhardt*, 362 F.3d 28, 32 (2d Cir. 2004) (*per curiam*) (internal quotation marks and citations omitted); *see also Estrella v. Berryhill*, 925 F.3d 90, 95–96 (2d Cir. 2019); *Burgess*, 537 F.3d at 129. The ALJ improperly considered the second, third, and fourth factors in assigning weight to the opinions of Plaintiff's treating sources and the SSA's consultative examiner.

Furthermore, while an ALJ is entitled to disregard the opinion of a plaintiff's treating physician after providing the physician the opportunity to correct the deficiencies in his or her medical reports, the ALJ must make clear that this decision is based on conclusions made by other medical professionals. *See Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) ("The ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion." (citation omitted)); *Hilsdorf v. Comm'r of Soc.*

7

*Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010) ("Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted [her] own opinion for that of a physician, and has committed legal error.").

Plaintiff received primary care and pain management treatment at the Woodhull Medical Center. (*See generally* Tr. at 313–454, 463–610.) She first reported her back pain to her internist, Samia Rizkalla, M.D., on July 20, 2015 (*id.* at 366–67), and stated on August 14, 2015 that the pain began in June 2015 and had progressed, thereby "limiting her ability to perform her daily activity" (*id.* at 368). Diagnostic imaging performed on August 14, 2015 revealed overhanging osteophytes[8] and sclerotic changes. (*Id.* at 375.)

Physiatrist Daniel H. Cheng, M.D., began to see Plaintiff annually in September 2015. (*Id.* at 308–10.) Dr. Cheng diagnosed Plaintiff with severe low back pain with an onset date of June 2015, prescribed physical therapy, and, in September 2018, determined that Plaintiff's functional capacity rendered her unable to work for at least 12 months. (*Id.* at 309–10.) In August 2018, Dr. Rizkalla recorded that Plaintiff's pain was worsening and also referred her to physical therapy. (*Id.* at 306–07.)

---

[8] Osteophytes, or "bone spurs[,] are bony projections that develop along bone edges. . . . They can also form on the bones of [one's] spine." *Bone Spurs*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/bone-spurs/symptoms-causes/syc-20370212 (last visited Mar. 31, 2020).

An MRI of Plaintiff's lumbar spine on March 16, 2016 revealed mild grade 1 anterior spondylosis[9] of L4 on L5 and L5 on S1; mild levoscoliosis[10]; disc height loss and desiccation changes; mild broad-based disc protrusion[11] at L2/L3; degenerative changes in the facet joints at L3/L4; mild broad-based disc protrusion with a focal right paracentral protrusion; mild narrowing [] with indentation of the thecal sac on the right; severe narrowing of the right lateral recess region; significant narrowing of the neural foramina[12]; mild broad-based disc protrusion with significant degenerative changes of the facet joints and ligamentous hypertrophy, producing a moderate narrowing of the canal; narrowed lateral recess regions without impingement on the nerve roots exiting; and moderate narrowing of the neural foramen[,] left greater than right. (*Id.* at 511–12). Dr. Rizkalla referred Plaintiff to follow up with physical therapy and to start pain management. (*Id.* at 480–81.)

On April 22, 2016, Plaintiff began treatment for her lower back pain in Woodhull Medical Center's pain management clinic. (*Id.* at 493.) At that time, NP Agnes G. Toussaint diagnosed

---

[9] Spondylosis is "Ankylosis[, the stiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint; fusion] of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature." *See Spondylosis*, *Stedman's Medical Dictionary* 840410.

[10] "Levoscoliosis is the curvature of the spine to the left side." *Bradley v. Colvin*, 110 F. Supp. 3d 429, 435 n.7 (E.D.N.Y. 2015) (citation omitted).

[11] Disc protrusion, or a herniated disc, is "protrusion of a degenerated or fragmented intervertebral disc into the intervertebral foramen with potential compression of a nerve root or into the spinal canal with potential compression of the cauda equina in the lumbar region or the spinal cord . . . ." *See Herniated disc*, *Stedman's Medical Dictionary* 251770.

[12] Neural foramina "are the openings of the sides of the Spinal canal where the nerve roots exit." *Neural Foramina*, Augusta University Spine Glossary, https://www.augustahealth.org/spine/spine-glossary/spine-glossary-neural-foramina (last visited Mar. 31, 2020).

Plaintiff as having an intervertebral disc[13] disease of the lumbar spine with radiculopathy,[14] and myalgia.[15] (*Id.*) Plaintiff's diagnosis, symptoms, and pain intensity assessment—a nine on a scale of ten—remained the same on May 3, 2016, and NP Toussaint did not note any improvement. (*Id.* at 494–95.) On May 24, 2016, Plaintiff received an epidural steroid injection of the lumbar spine (*id.* at 509), and afterwards reported heightened pain (*id.* at 545). Plaintiff was evaluated by NP Toussaint on four additional occasions in the year after Plaintiff began pain management treatment, with no documented improvement despite increases in pain medication. (*Id.* at 541–52, 556–67, 575–85, 590–602.)

In June 2017, Dr. Cheng completed a Disability Impairment Questionnaire and diagnosed severe degenerative disc disease of the lumbar spine at L3 through S1 and lumbar stenosis, citing Plaintiff's X-ray for this assessment. (*Id.* at 618.) Dr. Cheng identified Plaintiff's primary symptoms to be severe pain, stiffness, reduced motion in the lumbar spine, and weakness and numbness in the legs. (*Id.* at 619.) He opined that Plaintiff was unable to sit or stand/walk for even an hour continuously in an 8-hour workday, needed to rise and move every 15 to 30 minutes after sitting, must elevate her legs to chest level when sitting for more than 30 minutes, and that she could never lift or carry even five pounds. (*Id.* at 620.) In all, Plaintiff was treated numerous times by three different medical professionals at Woodhull Medical Center from the onset of her back pain until the ALJ's decision in November 2017.

---

[13] Intervertebral disc refers to "a disc interposed between the bodies of adjacent vertebrae. It is composed of an outer fibrous part (anulus fibrosus) that surrounds a central gelatinous mass (nucleus pulposus)." *See Intervertebral Disc*, Stedman's Medical Dictionary 251820.

[14] Radiculopathy is a "[d]isorder of the spinal nerve roots." *See Radiculopathy*, Stedman's Medical Dictionary 748650.

[15] Myalgia is defined as "[m]uscular pain." *See Myalgia*, Stedman's Medical Dictionary 581020.

Nonetheless, the ALJ afforded the opinions of NP Toussaint and Dr. Cheng "little weight," finding that their opinions were "not supported by the objective evidence or the claimant's limited treatment history." (*Id.* at 26.) The ALJ based this determination on Dr. Cheng's limited treatment relationship with Plaintiff and the inconsistency of his evaluation with Plaintiff's "very conservative treatment exclusively with pain medications and a single injection, without any consultations with neurological or orthopedic specialists or ongoing efforts at physical or aquatic therapy." (*Id.* at 25.)

"[T]he opinion of [a] treating physician [is not] to be discounted merely because he has recommended a conservative treatment regimen." *Burgess*, 537 F.3d at 129. The ALJ cannot impose her notion that "the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered," as "[t]his is not the overwhelmingly compelling type of critique that [] permit[s] the Commissioner to overcome an otherwise valid medical opinion. *Shaw v. Chater*, 221 F.3d 126, 135–36 (2d Cir. 2000) (citation omitted); *see also Corona v. Berryhill*, No. 15-CV-7117 (MKB), 2017 WL 1133341, at *17 n.31 (E.D.N.Y. Mar. 24, 2017) (noting that, on remand, the ALJ should not discount the treating physician's opinion "only because his course of treatment was conservative"). The record reflects that Plaintiff's pain increased following both physical therapy (*see, e.g.*, Tr. at 531, 612) and the epidural injection (*id.* at 530–32), suggesting that it was reasonable to abandon this course of treatment. In addition to physical therapy and an epidural injection, Plaintiff was prescribed multiple medications for pain management, the doses of which increased over time. (*Id.* at 590–91.) Nonetheless, the ALJ noted numerous times that Plaintiff's "limited treatment history" did not support the opinions of her treating sources. (*Id.* at 22, 25–26.) The Court finds that, because the ALJ relied heavily on what she deemed to be the "conservative treatment" that Plaintiff received, her conclusion is not

11

supported by substantial evidence in the record.[16] *See, e.g.*, *Jazina v. Berryhill*, No. 16-CV-01470 (JAM), 2017 WL 6453400, at *6 (D. Conn. Dec. 13, 2017) (finding powerful prescription opioids, other prescription drugs, and past physical therapy and injections not to be conservative treatment); *cf. Penfield v. Colvin*, 563 F. App'x 839, 840 (2d Cir. 2014) (summary order) (finding a regimen consisting of walking, home exercise programs, and gentle stretching to be "conservative treatment"); *Burgess*, 537 F.3d at 129 (taking only over-the-counter medicine to alleviate pain may support a conclusion of non-disability if that fact is accompanied by other substantial evidence in the record).

Plaintiff also contends that the ALJ failed to properly weigh the opinions from NP Toussaint based on a perception that there was no clinical or objective medical support for such

---

[16] Although not highlighted by Plaintiff, the ALJ did not consider an independent WeCARE medical evaluation admitted into the record when determining whether Plaintiff's treating providers' medical opinion evidence was supported by the record, a legal error also requiring remand. "WeCARE is a New York City Human Resources Administration public assistance program designed to help low-income clients with medical and/or mental-health issues find employment and/or apply for disability benefits." *McColl v. Saul*, No. 18-CV-04376 (PKC), 2019 WL 4727449, at *3 n.4 (E.D.N.Y. Sept. 27, 2019) (internal quotation marks and citation omitted). FEDCAP, the WeCARE contractor, completed a medical evaluation to determine whether Plaintiff was employable and had functional limitations. (*See* Tr. at 275–303.) The initial assessment, completed on July 13, 2015, noted that Plaintiff was "currently unable to access pub[l]ic transportation due to pain." (*Id.* at 277.) On that date, Plaintiff reported "[hypertension], heart problems, back pain, and a growth in the groin area." (*Id.* at 278.) She also described difficulty walking and climbing stairs. (*Id.* at 283.) As part of this process, Dr. Mehjabeen Ahmed, an internist, evaluated Plaintiff on July 13, 2015. (*See id.*) During a review of systems, Dr. Ahmed commented that Plaintiff had "paravertebral tenderness on to the lower back . . . positive on right side, painful movements of the spine, left shoulder decreased [range of motion] and painful movements, . . . has difficulty ambulating, [and] difficulty getting on and off the table." (*Id.* at 297.) Dr. Ahmed found that Plaintiff had exertional limitations for lifting, standing, walking, pushing, pulling, sitting, kneeling, and squatting due to low back pain. (*Id.* at 298–99.) Dr. Ahmed recommended a travel accommodation of "para-transit services needed" as Plaintiff "is unable to take public transportation due to back pain," and determined that Plaintiff was "[t]emporarily [u]nable to [w]ork." (*Id.* at 302.) Failure to acknowledge a medical opinion, let alone explain its weight and significance, is legal error sufficient to warrant remand. *See Hubbard v. Comm'r of Soc. Sec.*, No. 18-CV-3119 (RWL), 2019 WL 3940150, at *11–12 (S.D.N.Y. Aug. 5, 2019) (reversing an ALJ for failing to consider and weigh a WeCARE evaluation).

opinions, as Toussaint is a nurse practitioner. (*See* Pl.'s Br., Dkt. 11, at 14; Tr. at 25–26.) While under the regulations a nurse practitioner is not considered an "acceptable medical source," and her opinions cannot be afforded controlling weight pursuant to 20 C.F.R. 416.927(c), *see Wider v. Colvin*, 245 F. Supp. 3d 381, 389 (E.D.N.Y. 2017), "an ALJ may not disregard opinion evidence from a nurse practitioner . . . solely because it was not authored by an acceptable medical source," *Figueroa v. Saul*, No. 18-CV-4534 (JLC), 2019 WL 4740619, at *24 (S.D.N.Y. Sept. 27, 2019) (citation omitted). "The regulations permit consideration of opinions by other treating sources 'to show the severity of [the claimant's] impairment(s) and how it affects [the claimant's] ability to work.'" *Fitzwater v. Berryhill*, 16-CV-696 (MAT), 2017 WL 4563899, at *5 (W.D.N.Y. Oct. 13, 2017) (quoting 20 C.F.R. § 404.1513(d)); *see also* SSR 06-03p. 2006 WL 2329939 (Aug. 9, 2006). On remand, the ALJ is directed to accord the appropriate weight, as permitted under the regulations, to NP Toussaint, given that she regularly evaluated and treated Plaintiff.

**B.     The ALJ Gave Undue Weight to the Opinion of the Consultative Examiner**

Conversely, the ALJ accorded "great weight" to the opinion of the consultative examiner, Shenecia Beecher, M.D., regarding Plaintiff's asthma-related respiratory restrictions and exertional and postural limitations, and "partial weight" to Dr. Beecher's assessment that Plaintiff had a moderate limitation for prolonged walking, prolonged standing, climbing, lifting, carrying, mild to moderate limitations in kneeling and squatting, and no limitations in reaching, sitting, pushing, and pulling. (Tr. at 24.) Dr. Beecher evaluated Plaintiff once, in January 2016 (*id.* at 457), and there is no indication that Dr. Beecher reviewed Plaintiff's diagnostic scans (*id.* at 457–61). There is also no indication that Dr. Beecher reviewed Plaintiff's treatment records from the Woodhull facility (*id.*), and, given the timing of her examination, Dr. Beecher could not have had the benefit of reviewing Plaintiff's MRI, performed on March 16, 2016 (*id.* at 511). The

Commissioner must provide a consultative examiner with "necessary background information" about a claimant's condition, 20 C.F.R. § 416.917, and failure to provide at least the X-ray to the consultative examiner undermines the partial-to-great weight that was given to her opinion.

"ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419 (citation omitted). The ALJ relied significantly on Dr. Beecher's opinion, despite Dr. Beecher's having performed a one-time, incomplete examination, and without review of any of Plaintiff's medical history or radiological studies. That reliance is legal error requiring remand. *See Burgess*, 537 F.3d at 132 (holding that the opinion of a consultative examiner who did not review a crucial MRI report could not constitute substantial evidence); *Forges v. Comm'r of Soc. Sec.*, No. 15-CV-6082 (BMC), 2016 WL 3102020, at *7 (E.D.N.Y. June 2, 2016) (finding that "the consultants' examinations upon which the ALJ placed primary reliance" suffered "infirmit[y]" because there was no indication that the examiners "reviewed any medical records"); *Jackson v. Colvin*, No. 13-CV-5655 (AJN) (SN), 2014 WL 4695080, at *20 (S.D.N.Y. Sept. 3, 2014) (finding the fact that a consultative examiner had not reviewed claimant's medical records undermined the ALJ's determination of giving "great weight" to that examiner).

## II. Instructions on Remand

Plaintiff also argues that the ALJ failed to properly evaluate her testimony, a legal error requiring remand. (Pl.'s Br., Dkt. 11, at 15.) The Court does not reach that argument, as the ALJ's failure to properly weigh the medical evidence is sufficient error to require remand. However, the Court does direct that, on remand, the ALJ defer to the medical testimony interpreting Plaintiff's

14

objective medical evidence,[17] such as Plaintiff's diagnostic scans, and does not substitute his or her own expertise. *Compare* (Tr. at 21 ("The MRI did not reveal any significant findings to account for [Plaintiff's] allegations that her extreme back pain and lower extremity radiculopathy and paresthesis 'started suddenly' in late June 2015 . . . ."), *with Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010) (summary order) (finding that "the ALJ was not at liberty to substitute his own lay interpretation of that diagnostic test for the uncontradicted testimony of [plaintiff's doctor], who is more qualified and better suited to opine as to the test's medical significance" (citation omitted)), *Crocco v. Berryhill*, 15-CV-6308 (MKB), 2017 WL 1097082, at *12 (E.D.N.Y. Mar. 23, 2017) (finding ALJ erred in determining that the MRI and EMG evidence undermined treating physician's diagnosis of lumber and cervical radiculopathy), *and Jakubowski v. Berryhill*, No. 15-CV-6530 (MKB), 2017 WL 1082410, at *15 (E.D.N.Y. Mar. 22, 2017) (finding ALJ impermissibly concluded that MRIs and clinical examinations could not support opinion of treating physician that was based on the same findings).

The Court also reminds the ALJ that she or he has an affirmative obligation to fully develop the administrative record. *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). Where the "report from claimant's medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques," the ALJ must seek additional evidence or clarification. *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1)). "Thus, if a physician's finding in a report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the

---

[17] Objective medical evidence is "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques[.]" 20 C.F.R. § 404.1529(c)(2).

ALJ must seek clarification and additional information from the physician to fill any clear gaps before dismissing the doctor's opinion." *Id.* (citations omitted).

## CONCLUSION

For the reasons set forth herein, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion. The Commissioner's decision is remanded for further consideration consistent with this Memorandum and Order. The Clerk of Court is respectfully requested to enter judgment and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 31, 2020
      Brooklyn, New York